1

THE HONORABLE JOHN C. COUGHENOUR

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

YVETTE BAILEY,

Plaintiff,

v.

ALPHA TECHNOLOGIES, INC., *et al.*,

Defendants.

Case No. 2:16-cv-00727-JCC

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Note on Motion Calendar:**

**Friday, August 18, 2017**

ORAL ARGUMENT REQUESTED

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC)

136297748.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS ................................................................................... 1

    A.     Plaintiff's Employment at Altair and Alpha ............................................. 1

        1.     Job Title, Duties, and Classification as an Exempt Employee ................. 2

        2.     Transfer from Altair to Alpha in March 2015 ............................ 4

        3.     Trip to the Bahamas to Meet with the TCS Managing Director............... 5

    B.     Plaintiff's Termination From Alpha in August 2015 ............................................. 7

    C.     Plaintiff's Claims ...................................................................................... 8

        1.     Plaintiff's Evidence Regarding Her Wrongful Termination Claim........... 8

        2.     Plaintiff's Evidence Regarding her Classification as an Exempt Employee ................................................................................................ 10

        3.     Plaintiff's Evidence Regarding Defamation ................................. 10

    D.     Plaintiff Has Failed to Repay a Series of Personal Loans From Grace Borsari ................................................................................................... 11

III.   ARGUMENT .................................................................................................... 11

    A.     Standards for Summary Judgment ........................................................ 11

    B.     Plaintiff's Wrongful Termination Claim Is Speculative and Fails as a Matter of Law ......................................................................................... 12

        1.     Plaintiff Has Failed to Adduce Evidence of Causation ......................... 13

        2.     Alpha Had a Legitimate Nonretaliatory Reason to Fire Bailey, And She Has No Evidence to Suggest That Reason Was Pretextual .............. 14

    C.     Plaintiff's Wage Claims Fail as a Matter of Law and Should Be Dismissed ...... 15

        1.     Administrative Employees Are "Exempt" From Overtime Pay Requirements ........................................................................................ 15

        2.     The "Discretion and Independent Judgment" Requirement ................... 17

        3.     Bailey's MWA and FLSA Claims Fail Because She Was Properly Classified as Administratively Exempt...................................................... 19

        4.     Defendants Have Not Willfully Withheld Wages Due to Plaintiff.......... 21

    D.     Plaintiff's Defamation Claim Should Be Dismissed ............................................. 21

        1.     Plaintiff Cannot Prove Any Defamatory Statement Was Made ............. 22

        2.     The Alleged Statement Is An Opinion, Not a Fact Provable as False ................................................................................................... 22

        3.     The Alleged Statement Is Privileged .................................... 23

    E.     Defendant Borsari Is Entitled to Recover on Her Breach of Contract Claim...... 24

IV.    CONCLUSION.................................................................................................. 24

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – i

136297748.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# I.   INTRODUCTION

Defendants Alpha Technologies, Inc. ("Alpha"), Altair Advanced Industries, Inc. ("Altair"), Fredrick Kaiser and Grace Borsari move for summary judgment dismissing all of Plaintiff's claims, and Defendant Borsari moves for summary judgment on her counterclaim for breach of three Promissory Notes.

Plaintiff's primary claim—for wrongful termination in violation of public policy— fails because she cannot establish the causation element of her prima facie case.  Specifically, she has no evidence to support her allegation that her dismissal was caused by a report of tax fraud.  She *made* no such report, and even if the minor pricing discrepancies she noted could, indirectly and remotely, have tax implications, the undisputed evidence shows that she was *rewarded* for her efforts in that regard, not punished.  Moreover, undisputed evidence reveals the actual reason for her discharge, which occurred over six months after she reported the pricing discrepancies.  That evidence is a withering report about the Plaintiff's conduct from a trusted business associate of Alpha's CEO.  That report was the sole reason for Plaintiff's termination.  By contrast, Plaintiff's attribution of motive for her firing is pure speculation, a cynical *post-hoc* bid to create a claim.

Plaintiff's wage claims also fail for an obvious reason established by undisputed facts, namely, because she was at all relevant times properly classified as an "administrative-exempt" employee, and therefore not entitled to overtime pay, including pay for alleged "on-call" time.

Finally, Plaintiff has no evidence to support her vague defamation claim, and even if she did, it would fail because the alleged statement is one of opinion, and is privileged.  Meanwhile, undisputed facts establish Borsari's entitlement to judgment on her breach of contract claim.

# II.   STATEMENT OF FACTS

## A.   Plaintiff's Employment at Altair and Alpha

Defendants Alpha and Altair are privately held Washington companies that make power supplies and related equipment for the cable TV, communications, and renewable energy industries.  Alpha is 100% owned by its CEO, Defendant Fredrick Kaiser, and currently employs about 189 people.  Altair is 100% owned by its CEO, Defendant Grace Borsari, and employs

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 1

136297748.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

about 217 people.  Declaration of Fredrick Kaiser ¶¶ 1-2.  As Plaintiff alleges, "Altair is the licensed manufacturer for Alpha Technologies."  Declaration of Joseph M. McMillan, Ex. A (Bailey dep.) at 43.[1]  Alpha owns the intellectual property and provides engineering, marketing, and other administrative services for the distribution and sale of Alpha-branded equipment manufactured by Altair.  Kaiser Decl. ¶ 2; Ex. A at 42-43.

"To manufacture 'Alpha' branded products, [Altair] uses hundreds of components manufactured in China."  Second Am. Compl. ¶ 4.4.  At the time of her termination in August 2015, Plaintiff Yvette Bailey was employed at Alpha as a Senior International Buyer responsible for the acquisition of those components.  In that role, as in her previous position at Altair up until March 2015, Bailey negotiated with Asian manufacturers on the pricing of components, sub-assemblies, and finished goods.  In addition to procurement, she also managed relationships and supply chains with Asian vendors and service providers, coordinating efforts to seek cost reductions, ensure product quality, and assist in new product development.  Kaiser Decl. ¶ 3.

### 1.     Job Title, Duties, and Classification as an Exempt Employee

Bailey was hired in 1990 by Altair's predecessor corporation, GB Enterprises, Inc.  Her first position with the company was as a "purchasing clerk."  Ex. A at 21-22.  By the time period relevant to this case (2013-2015),[2] GB Enterprises had changed its name to Altair Advanced Industries, Inc., and Bailey had risen to a position of "Senior Buyer" (or "Buyer 3," a job level reflecting senior status), specifically, "International Senior Buyer for Asia."  Ex. A at 22.  From at least 2007 through her termination from Alpha in August 2015, Bailey held that job, first at Altair, then at Alpha.  Ex. A at 27; Ex. B.  As Senior International Buyer for Asia, Bailey "managed the contract manufacturers that were located in Asia" and "all of the aspects that go with managing a contract manufacturer in another country."  Ex. A at 28.  That included

---

[1] Unless otherwise noted, all exhibits are attached to the McMillan Declaration.

[2] The original Complaint in this action was filed May 20, 2016.  Plaintiff's wage claims have a three-year statute of limitations.  *Mitchell v. PEMCO Mut. Ins. Co.*, 134 Wn. App. 723, 737 (2006) ("Wage and hour claims have a three-year statute of limitations in Washington"); *Flores v. City of San Gabriel*, 824 F.3d 890, 906 (9th Cir. 2016) ("the two-year statute of limitations for actions under the FLSA may be extended to three years if an employer's violation is deemed 'willful'").  The allegations concerning Plaintiff's other claims—termination in violation of public policy and defamation— relate to events occurring in 2015.  Second Am. Compl. (Dkt. #30) ¶¶ 4.17-4.28.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 2

136297748.2

"manag[ing] the build of materials, the costing of those build materials," and "mak[ing] sure we met our customer delivery dates with products to the production floor, the logistics, arranging delivery." *Id*. She also worked with the Alpha engineering team on new product development, managing Asian suppliers "through the entire development stage to release to production." *Id*. at 29-30. As stated in her résumé, Bailey "[s]uccessfully executed the roll out of new products from conception thru [*sic*] production." Ex. C.

Bailey had been a Senior Buyer at Altair (or its predecessor GB Enterprises) since 2000. Ex. B. In March 2015, Bailey transferred from Altair to Alpha, but her job title and responsibilities as a Senior Buyer did not change. Ex. D; Ex. A at 40. Bailey testified that her job duties at Alpha were accurately set forth in the "Position Description" she signed at the time of her transfer. Ex. E; Ex. A at 40-41. Those duties included "develop[ing] sources of supply," which she acknowledges entailed evaluating, comparing and selecting suppliers in order to procure "the most appropriate cost-effective quality product for [her] employer." Ex. A at 44-45, 48. Bailey would also "evaluate each purchase requisition" and "determine the most appropriate method of procurement," making decisions based on "lots of criteria that go into that." *Id*. at 46-47. In addition, Ms. Bailey negotiated price reductions and managed vendor relationships to promote efficiency and ensure product quality. *Id*. at 28, 48, 85, 94; Ex. B, C, E.

In procuring components or finished goods that were incorporated into or distributed as Alpha-branded products, Bailey's work as a Senior Buyer was directly related to the core business operations of her employers, at both Altair (from 1990 to March 2015) and Alpha (from March to August 2015). Senior Buyer was not a manual labor position, and throughout the relevant period (2013-2015) the pay substantially exceeded $455 per week. Bailey's salary from Altair in 2013 and 2014 was over $54,000 per year, and upon transferring to Alpha in March 2015, she received a pay raise to "close to $70,000" per year. Ex. A at 34-35, 41; Exs. D, E, F, G. In light of these facts, and because her primary duties as Senior Buyer involved in the exercise of independent judgment and discretion, Bailey was classified as a salaried, "administrative-exempt" employee at all times relevant to this case. She was not an hourly

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 3

136297748.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1   worker eligible for overtime pay.  Declaration of Kim Rice ¶¶ 3-8; Declaration of Bart Griffith

2   ¶¶ 3-7; Exs. B, C, D, E, F, G, W.

3        **2.**       **Transfer from Altair to Alpha in March 2015**

4        Bailey was transferred from Altair to Alpha on March 1, 2015, in order to be better

5   positioned to manage the relationship with an important supplier and service provider,

6   Telecomponents & Supply, Ltd. ("TCS").  Defendant Fredrick Kaiser is the sole owner of TCS.

7   Among other things, Bailey's transfer would help prevent the inappropriate disclosure of TCS's

8   confidential business information to its customer, Altair, and allow Bailey to monitor the TCS

9   price lists and gross profit margins on Chinese components acquired by TCS for sale to Altair.

10  Bailey could monitor those prices and margins because she often had visibility into TCS costs

    due to her role in negotiating price reductions alongside TCS representatives.  Kaiser Decl. ¶ 5.

11       TCS is a third party entity with offices in the Bahamas (where Kaiser resides) and in

12  Hong Kong.  TCS provides key services in locating and qualifying component manufacturers in

13  China, coordinating site visits, assisting in communicating product specification and design

14  requirements, engineering support, quality assurance, price negotiation, purchasing, translation

15  and cultural consulting, vendor management, expediting, and other services with respect to

16  manufacturing, logistics, regulatory and export issues.  Alpha and Altair rely heavily on TCS for

17  these services.  Kaiser Decl. ¶ 4; Ex. H (David Fox dep.) at 21-23, 31, 111-13.

18       Kaiser and Borsari met with Bailey in February 2015 and asked her to transfer from

19  Altair to Alpha because her role in dealing with contract manufacturers in China was "a function

20  of TCS," which she could perform better from an Alpha platform, where she reported directly to

21  Kaiser, the owner of both Alpha and TCS.  Ex. A at 36-37; Kaiser Decl. ¶¶ 1, 5.  The transfer

22  was prompted by Bailey informing her then-boss, Grace Borsari, in early 2015 that the most

23  recent TCS price list did not reflect certain price reductions she had negotiated.  Ex. A at 72-74,

24  77-82, 196-98.  The TCS price list (*i.e.*, the prices Altair paid to TCS for components acquired

25  from Asian manufacturers for Altair's use in making Alpha-branded products) was typically

    updated twice a year, in January and July.  Ex. A at 79-80, 122-23.  Bailey testified that she was

26

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 4

136297748.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

"transferred over [to Alpha] to oversee the TCS price list" after alerting Borsari and Kaiser that TCS's January 2015 price list did not reflect recent price reductions she had negotiated for certain components.  Ex. A at 193-200.  Kaiser and Borsari appreciated Bailey's good work in bringing this discrepancy to their attention.  Kaiser Decl. ¶ 5.  Bailey likewise expressed her appreciation for the new job opportunity, which entailed a 10% pay raise.  Ex. I; Ex. D.

In the months following her transfer, Bailey continued working on price negotiation and cost reduction, receiving compliments from Mr. Kaiser for her successes.  *See, e.g.*, Kaiser Decl., Ex. 1.  Bailey expressed her thanks to both Kaiser and Borsari again in July 2015, and Kaiser responded, saying that her job "will get even more rewarding over the next 25 years."  *Id.*, Ex. 2. Bailey acknowledges that as of mid-July 2015, she had a good working relationship with Kaiser and Borsari.  Ex. A at 151-52.

### 3.     Trip to the Bahamas to Meet with the TCS Managing Director

In mid-July 2015, Kaiser requested that Bailey accompany him on a business trip to the Bahamas for a meeting with the TCS Managing Director, Mr. Peter Turnquest.  In addition to his role with TCS, Turnquest was also a prominent politician and member of the Bahamian Parliament.[3]  One purpose of the trip was to review the current TCS price list to make sure that it correctly reflected price reductions that Bailey had negotiated.  Another purpose was to introduce Bailey to Turnquest, since in her new role at Alpha Bailey was now monitoring TCS prices and profit margins on components and goods acquired in China.  Kaiser Decl. ¶ 6; Ex. J.  Bailey had been informed by Kaiser and Borsari that, in general, the TCS profit margins on those components and goods should not exceed 25%.  Second Am. Compl. ¶ 4.15.  If they were to exceed that range, Bailey understood—based solely on statements from Kaiser and Borsari—that "it "[p]otentially could be a problem with the IRS," and they "didn't want to have any more trouble with the IRS."  Ex. A at 189-201.

Bailey traveled to the Bahamas with Kaiser on August 16 and returned on August 21, 2015.  As a way of thanking Bailey for her good work, Kaiser invited her to bring her husband

---

[3] In May 2017, Mr. Turnquest became Deputy Prime Minister and Minister of Finance of the Bahamas, positions he currently holds.  Kaiser Decl. ¶ 6.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

along for a short vacation.  Bailey, her husband, and Kaiser flew to Freeport in Kaiser's private

jet.  Kaiser Decl. ¶ 6.  Bailey sent an email to a business associate describing the upcoming trip:

> Fred is flying me to TCS Bahamas office to have business meetings now that I
> work for him directly.  My husband gets to go as well working 3 days of 7 days
> before he flys [*sic*] us home again.  Should be interesting and fun at the same
> time.
>
> Will be flying like a rock star . . . .

Ex. K.  Bailey also sent another email thanking Borsari again for all that she and Kaiser had done

for her over the years.  Ex. L.

In the Bahamas, Bailey spent approximately a half-day in a business meeting with Kaiser

and Turnquest.  She also participated in two work-related conference calls, but was otherwise

free for most of the week to enjoy the Bahamas with her husband.  Ex. A at 176-80.  In the

business meeting with Kaiser and Turnquest, the TCS price list was revised, with the updated

prices to go into effect on September 1, 2015.  In addition, Kaiser told Turnquest that Bailey now

worked directly for him at Alpha, and would be monitoring the TCS price list.  He explained that

Bailey's new role should be seen as "an extension of TCS" and that in the future her "salary

[would] be billed from [Alpha] to TCS Bahamas office."  Ex. A at 201; Ex. M; Kaiser Decl. ¶ 7.

In that meeting, Bailey explained that the personnel associated with TCS's Hong Kong office did

"an outstanding job" for her in negotiating with and managing Chinese component

manufacturers; that they were her "eyes and ears at the factories and that without [them] [she]

could not do [her] job successfully."  Ex. M; Ex. A at 205-206.

On that trip, Kaiser also followed up on a proposal to *expand* Bailey's responsibilities, a

proposal he had initially made in March 2015 when Bailey transitioned from Altair to Alpha.

Specifically, he asked Turnquest to provide information to allow Bailey to assess whether she

could oversee not only Chinese contract manufacturers, but Indian manufacturers as well.  Ex. A

at 211-14.  This proposed expansion of Bailey's responsibility, like the raise she received in

March 2015, the complimentary emails from Kaiser and Borsari, and the trip to the Bahamas

with her husband on Kaiser's private jet, reflected the approval she had earned from Defendants

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 6

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

for her good work up until the time of the Bahamas trip.  Kaiser Decl. ¶ 8.

**B.    Plaintiff's Termination From Alpha in August 2015**

Kaiser, Bailey and her husband left the Bahamas on August 21, 2015, flying back to the United States on Kaiser's private jet.  That same day, Turnquest sent Kaiser an email expressing deep indignation concerning conduct by Bailey and her husband during the trip that had been reported to him.  In that email, Turnquest informed Kaiser that Bailey or her husband, after mentioning their connection to both Kaiser and Turnquest in a Freeport bar, had attempted to purchase illegal drugs, and then proceeded to say "very inflammatory things and make . . . serious accusations" about Turnquest in particular.  Ex. N.  Turnquest reported that, while drinking at the hotel bar, the Baileys made "the most outlandish claims and accusations against me and what I do, you and our operations here," which "placed me in the unfortunate and embarrassing position of having to defend our good names, business and character in Freeport," where both Turnquest and Kaiser reside.  *Id*.  Turnquest informed Kaiser that, as a result of this conduct, he no longer wished to work with Ms. Bailey.  Kaiser Decl. ¶ 9.

On August 26, 2015, several days after receiving this email, and as a direct consequence of it, Alpha terminated Bailey's employment.  Kaiser made the decision based entirely on the damaging content of the email, which reflected an irremediable rupture in the relationship between Bailey and TCS's Managing Director.  That development completely nullified Kaiser's hope that he could rely on Bailey to successfully manage the TCS price list and relationship generally.  Kaiser was shocked and deeply offended, reactions premised on his very high regard for and trust in (now Deputy Prime Minister) Turnquest, a man with whom he had worked closely for decades, who had now been gratuitously insulted and embarrassed in his home town by one of Kaiser's employees.  Kaiser Decl. ¶¶ 10-11.

After considering the matter for several days, Kaiser called Bailey into his office and told her that they were going to have to part ways.  He generally described the information he had received, and in the face of Bailey's denials about drug use or solicitation, explained that the accuracy of the report was not the decisive factor.  Instead, what was decisive was the fact that

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 7

136297748.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

the relationship with Turnquest has been damaged beyond repair, which eliminated Bailey's ability to fulfill her role at Alpha, as Turnquest refused to work with her going forward.  Ex. A at 215-16; Ex. O (Kaiser dep.) at 334-37; Rice Decl. ¶ 9.  As Bailey testified, Kaiser's reaction to her denial of misconduct was: "it doesn't matter . . . because Peter [Turnquest] doesn't want to work with you."  Ex. A at 216.  Kaiser's decision, however, was also informed by his own interaction with Bailey in the Bahamas, which revealed to him that Bailey had been discussing matters outside her area of responsibility.  Kaiser Decl. ¶ 11; Ex. O (Kaiser dep.) at 306-310.

**C.      Plaintiff's Claims**

Plaintiff's claims all arise from her termination.  The Second Amended Complaint asserts claims for: (1) Wrongful Termination in Violation of Public Policy; (2) Failure to Pay Overtime Wages; (3) Willful Withholding of Wages; and (4) Defamation.

**1.      Plaintiff's Evidence Regarding Her Wrongful Termination Claim**

Plaintiff alleges that she "was wrongfully terminated by Defendants because she reported to them that they were committing tax fraud."  Second Am. Compl. ¶ 1.2.  She bases that claim entirely on the fact that, as noted above, she brought a pricing discrepancy regarding a handful of components on the TCS price list to the attention of Borsari and Kaiser in February 2015.[4] Bailey testified that she had been told by Kaiser and Borsari that the TCS mark-up on components acquired in China and sold to Altair should be "[b]etween 20 to maximum 25 percent."  Ex. A at 189-90.  She had observed in January 2015, however, that "[i]n some cases, they were well over that."  *Id*. at 190.  Bailey brought that fact to the attention of her then-boss, Grace Borsari, but admits that she did not raise any question or issue about tax liability or tax evasion.  On the contrary, she testified that she "didn't allude to what kind of problem [the margins might create] because I don't know and I'm not a tax accountant."  *Id*. at 194-200.

Bailey testified that Kaiser and Borsari were not angry with her after she made that report.  *Id*. at 197.  Instead, they said that the TCS margins "needed to be resolved, needed to be corrected."  *Id*. at 193.  They met with Bailey and told her that, effective March 1, 2015, she

---

[4] The products that Altair acquires from TCS contain hundreds of components, at a minimum.  *See* Ex. A at 120 (Bailey: "each product had, you know, hundreds of parts on it").

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 8

136297748.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

would be "transferred over [to Alpha] to oversee the TCS price list," a duty that was added to her continuing responsibilities as Senior International Buyer for Asia. *Id*. at 198.  She served in that role for months and, as noted above, earned compliments from Kaiser for her cost reduction efforts. *See* Kaiser Decl., Ex. 1 ("You are doing a remarkable job and this cost reduction will be considered in your Bonus for sure").  Kaiser decided to take Bailey with him to the Bahamas in August 2015 "to correct some pricing issues that [she] had pointed out to [him] and Grace on [the TCS] price list."  Ex. A at 189-93; *id*. at 191 (Q: "You told them the margins were too high . . . , and then Fred said, Well, let's go down and talk about it?  A: "Right.").

Bailey admits that she has no education or background in accounting or tax issues, had no responsibility for tax reporting, and has never seen tax returns or financial statements for Altair, Alpha, or TCS.  Second Am. Compl. ¶ 4.14; Ex. A at 80-82.  She further admits that *she never raised* a tax liability or tax evasion issue.  *Id*. at 327-34.  Instead, she testified that:

> All I know is what I pointed out to Fred [Kaiser] and Grace [Borsari], and that was that the margin percentages [for some components on a TCS price list] were way too high.  That's what I have knowledge to.  When I got the latest price list, that's what I pointed out to them.  That's all I had knowledge of.

Ex. A at 208.  She raised this issue "[i]n late January or early February" of 2015.  *Id*. at 193.  Over six months later, in late August 2015, she was fired.  This is the entire basis for Bailey's wrongful termination claim.  There is no other evidence to support that claim.

Interestingly, in her written statement to the Washington Employment Security Department in September 2015 (shortly after she was terminated), Bailey made no mention of being fired for reporting tax fraud.  Instead, she set forth an alternative theory about why she was fired.  Specifically, she said that while in the Bahamas, "I overheard conversation of the owner being ripped off by our management company located in the Bahamas and before I was able to share that information with him lies were fabricated about my husband and I to ensure that information was never provided to him.  I was set up."  Ex. P.[5]

---

[5] This tends to corroborate Turnquest's report and Kaiser's impression that Bailey had been engaging in conversations about business matters well outside her areas of knowledge and responsibility.  Ex. N; Kaiser Decl. ¶¶ 11-12.  For evidence of the Baileys' drinking while in the Bahamas, *see* Ex. Q ("Been to lots of pool bars and seen some crazy shit I tell you").

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

2   ### 2.     Plaintiff's Evidence Regarding her Classification as an Exempt Employee

3       All of Bailey's wage claims are based on her contention that Defendants "misclassif[ied]

4   her as exempt to avoid paying her for all of the hours that she worked and to avoid paying her

5   overtime."  Second Am. Compl. ¶ 1.3.  As noted above, as a Senior International Buyer at Altair

6   and Alpha, Bailey was engaged in non-manual labor central to the business of her employers,

7   earning a salary well in excess of $455 per week, and routinely exercising discretion and

8   independent judgment in the exercise of her job duties.  Ex. A at 44-48; Rice Decl. ¶¶ 3-8; Exs.

9   B, D, E, G; Griffith Decl. ¶¶ 3-7.  For these reasons, like all full-time Buyers at Altair and Alpha,

10  Bailey was properly classified as an "administrative-exempt" employee.  Rice Decl. ¶¶ 6, 8.[6]

    ### 3.     Plaintiff's Evidence Regarding Defamation

11      Bailey's defamation claim is based on an allegation that "Defendants informed Plaintiff's

12  coworkers and possibly others that Plaintiff was terminated because she was a 'security risk.'"

13  Second Am. Compl. ¶ 5.11.  Bailey testified, however, that she has no recollection of who told

14  her that, or any knowledge of the context in which such a statement was made.  Ex. A at 334-40.

15  She believes she heard it from a co-worker she encountered in a grocery store.  Id.  Bailey

16  testified that, while she cannot identify the source or provide any specifics, she "thought" she

    was told that Fred Kaiser made such a statement.  Id. at 339.

17      Some light was shed on this vague allegation through the testimony of David McKee, a

18  former co-worker of Bailey's.  He testified that he saw her in a grocery store on one occasion

19  after her termination and said, jokingly, "should I be afraid of you?"  Ex. R (McKee dep.) at 69-

20  71; 74-75.  He went on to explain that he posed the question facetiously because he had seen

21  signs posted on certain doors at the Alpha facility saying "Keep Doors Closed," or words to that

22  effect.  When he inquired about why those signs had been posted, he was told by a different co-

23  worker that keeping the doors closed was a longstanding company policy that should be

24  respected, and that some employees had been let go recently.  Id. at 74-75.  McKee clarified that

---

[6] Bailey admits, however, that throughout the relevant period she *knew* she was a salaried, exempt employee—*i.e.*,
25  not earning overtime—and she never raised any questions or issues about that status while at Altair or Alpha.  Ex. A
    at 324-25.  She also admits that as a Purchasing Supervisor at her *new* job (at a company called VT Volant in
26  Burlington, WA) she is also classified as exempt, *i.e.*, receives no overtime pay.  Ex. A at 314.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 10

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

at no point did he ever hear any Alpha or Altair manager (much less Fred Kaiser or Grace Borsari) ever make any statement about Bailey being a "security risk," or indeed, any statement at all about the reasons for Bailey's termination.  *Id*. at 60, 75.

**D.      Plaintiff Has Failed to Repay a Series of Personal Loans From Grace Borsari**

During her tenure as an Altair employee, Bailey had an excellent relationship with Altair CEO Grace Borsari, and frequently expressed her gratitude to Borsari for the many opportunities and favors she received.  *See, e.g.*, Ex S; Ex. I; Ex. L.  Among the many forms of assistance that Borsari provided to Bailey were multiple personal loans, which were memorialized in a series of simple Promissory Notes.  Ex. T.[7]  Bailey is in breach of three of those Promissory Notes, representing $6400 in unpaid principal, plus interest.  Bailey acknowledges that she borrowed the money, signed each of the Notes, and has not re-paid any of the amounts due under the Notes.  Ex. A at 271-75.  By letter to Bailey's counsel dated April 18, 2016, Borsari provided notice of her demand for payment in full of all amounts due under each of the three Notes.  Ex. U.  After 30 days, with no payment received from Bailey, all principal and interest became due immediately pursuant to the Acceleration clause in each of the Notes.  Ex. T ¶ 5.  Borsari has counterclaimed for breach of the Notes (Dkt. #31), and seeks recovery of all principal, interest, and costs of collection (including attorneys' fees), as provided in the Notes.  Ex. T ¶¶ 5, 6.

## III.      ARGUMENT

**A.      Standards for Summary Judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  All reasonable inferences from the evidence should be drawn in the non-moving party's favor, but "the mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (opposing party "must do more than simply show that

---

[7] The Promissory Note bearing the bates number GB000002 modifies the Note bearing the bates number GB000003, altering the amount of the loan from $2200 to $3400.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 11

136297748.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    there is some metaphysical doubt as to the material facts."). "[M]ere allegation and speculation

2    do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Community*

3    *College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996). To defeat a motion for summary judgment, the

4    non-moving party must go beyond the pleadings to "present significant probative evidence

5    tending to support its claim or defense." *Intel Corp. v. Hartford Accident & Indem. Co.*, 952

6    F.2d 1551, 1558 (9th Cir. 1991); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th

7    Cir.1997) ("a conclusory, self-serving affidavit, lacking detailed facts and any supporting

8    evidence, is insufficient to create a genuine issue of material fact"). Failure of proof as to any

9    essential element of a party's claim is sufficient to require the dismissal of that claim. *Celotex*

10   *Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**B.    Plaintiff's Wrongful Termination Claim Is Speculative and Fails as a Matter of Law**

11          The Washington Supreme Court recognized the tort of wrongful termination in violation

12   of public policy in *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219 (1984). The Court

13   "emphasiz[ed] that the tort is a narrow exception to the at-will [employment] doctrine and must

14   be limited only to instances involving very clear violations of public policy." *Rose v. Anderson*

15   *Hay and Grain Co.*, 184 Wn.2d 268, 276 (2015). "Because [the Court] construe[s] this tort

16   exception narrowly, wrongful discharge claims have generally been limited to four scenarios:

17          (1) where employees are fired for refusing to commit an illegal act; (2) where
18          employees are fired for performing a public duty or obligation, such as serving
             jury duty; (3) where employees are fired for exercising a legal right or privilege,
19          such as filing workers' compensation claims; and (4) where employees are fired
             in retaliation for reporting employer misconduct, i.e., whistle blowing.

20   *Becker v. Community Health Systems, Inc.*, 184 Wn.2d 252, 258-59 (2015) (*quoting Gardner v.*

21   *Loomis Armored, Inc.*, 128 Wn.2d 931, 936 (1996)).[8]

22

23   ────────────────────

[8] "[W]hen the facts do not fit neatly into one of the four above-described categories, a more refined analysis may be
necessary. In those circumstances, the court should look to the four-part Perritt framework for guidance." *Rose*,
184 Wn.2d at 287. "Under [the] Perritt framework, courts examine (1) the existence of a 'clear public policy'
(clarity element), (2) whether 'discouraging the conduct in which [the employee] engaged would jeopardize the
public policy' (jeopardy element), (3) whether the 'public-policy-linked conduct caused the dismissal' (causation
element), and (4) whether the employer is '[un]able to offer an overriding justification for the dismissal' (absence of
justification element)." *Id.* at 277 (quoting *Gardner*, 128 Wn.2d at 941). In this case, Bailey alleges she was fired
for reporting employer misconduct, *i.e.*, whistleblowing. Second Am. Compl. ¶ 1.2 (Plaintiff was terminated

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 12

136297748.2

1
2
3

> The proper order and nature of proof for claims falling into one of the four standard scenarios is well established.  We apply the three-step, burden shifting test from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  The first step is for a plaintiff to make out a prima facie case for retaliatory discharge.

4

*Rickman v. Premera Blue Cross*, 193 Wn. App. 1048, at *3 (2016).  To do so, a plaintiff must

5

show causation, *i.e.*, that his or her "conduct in furthering a public policy was a 'substantial'

6

factor motivating the employer to discharge the employee."  *Id*.

7
8
9

> If the plaintiff presents a prima facie case, the burden of production shifts to the employer to articulate a legitimate nonpretextual nonretaliatory reason for the discharge.  If the employer meets this burden, the third component of the test requires the plaintiff to produce sufficient evidence that the employer's alleged nonretaliatory reason . . . was pretextual.

10

*Id*. (internal quotation marks and citation omitted).

11

### 1.    Plaintiff Has Failed to Adduce Evidence of Causation

12

In this case, Bailey's wrongful termination claim fails as a matter of law because she has

13

no evidence to establish causation, a key element of her prima facie case.  She *admits* that she

14

never even raised the issue of tax liability or tax evasion.  Ex. A at 327-34; *id*. at 332 ("I never

15

used those words.  That's not what I presented to them."); *id*. at 328 (Q: "Do you think that

16

[Defendants] were engaged in a purposeful effort to try and manipulate tax liability? . . . A: "I

17

can't answer that question.").[9]  She simply reported that certain prices she had negotiated were not

18

reflected in TCS's price list.  *Id*. at 208.  She admits that Defendants *agreed* that the prices "needed

19

to be corrected," *id*. at 193, and that they took steps to correct them by transferring her to Alpha: "I

20

was called up for a meeting and told that I would, effective March 1st, work for . . . Fred . . . and was

21

transferred over to oversee the TCS price list."  *Id*. at 198.  She received a 10% pay raise, a series of

22

complimentary emails from Kaiser and Borsari in the months that followed, and a short vacation to

23

the Bahamas with her husband as a reward for her good work.  Part of the purpose of that trip was "to

24

"because she reported to [Defendants] that they were committing tax fraud").  Accordingly, scenario (4) of the standard set applies, and the Perritt framework is not implicated.

25

[9] The unrebutted report of Defendants' transfer pricing expert, Patrick McColgan, shows that there is no basis for the specific allegation in Plaintiff's Second Amended Complaint that Defendants manipulated transfer pricing to try to

26

minimize tax liability in the United States.  *See* Ex. V (McColgan Report and Appendices).

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 13

136297748.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

correct some pricing issues that [she] had pointed out to Fred and Grace on [the TCS] price list." *Id*. at 189.  Bailey admits that on the eve of that trip, she had a good relationship with Kaiser and Borsari.  *Id*. at 152.  During the trip, which occurred over six months after she first raised the TCS price issue, Kaiser took steps to *expand* her area of responsibility.  *Id*. at 211-15; Kaiser Decl. ¶ 8.

These undisputed facts are utterly inconsistent with any contention that Defendants fired her for her service in bringing a handful of discrepancies on a detailed price list to their attention.  In short, there is simply no evidence to suggest that Bailey's report, in late January or early February 2015, regarding some incorrect prices on a TCS price list, had *anything* to do with her termination in late August 2015—let alone that it was a "substantial" cause for her termination.  As such, Ms. Bailey cannot establish the causation element of her prima facie case and, accordingly, her claim fails as a matter of law.  *Nelson*, 83 F.3d at 1082 ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment").

### 2.    Alpha Had a Legitimate Nonretaliatory Reason to Fire Bailey, And She Has No Evidence to Suggest That Reason Was Pretextual

Even if Bailey were able to establish a prima facie case—which she cannot—her wrongful discharge claim still fails because Defendants have a legitimate non-retaliatory reason for her termination, and she cannot show that reason was pretextual.  The undisputed evidence shows that Bailey was terminated in late August 2015, in the days following her trip to the Bahamas, after Kaiser received the extremely troubling report from Turnquest about the Baileys' conduct on that trip.  Ex. N.  Kaiser has testified that he believed that report, not only because of his high confidence in Turnquest, but because of his own experience with Bailey on the trip that lent additional credibility to its contents.  Ex. O at 306-310, 334-37; Kaiser Decl. ¶¶ 11-12.

Even if Turnquest's report was inaccurate, however, it is of no consequence, because Kaiser had a good-faith belief that Bailey's conduct warranted termination.  "[E]ven an incorrect belief. . . constitutes a legitimate, non-discriminatory reason."  *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991).[10]  By contrast, Bailey's subjective belief about Kaiser's motive,

---

[10] *Rivera v. City and County of Denver*, 365 F.3d 912, 924 (10th Cir. 2004) (an employer's reasons for the challenged action need not be "wise, fair or correct," as long as the employer "acted in good faith upon those

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 14

136297748.2

1    without more, is insufficient to avoid summary judgment.  *Griffith v. Schnitzer Steel Indus., Inc.*,

2    128 Wn. App. 438, 447 (2005) ("[A]n employee's subjective beliefs and assessments . . . are

3    irrelevant" to questions of employer intent).  In this regard, the Ninth Circuit's decision in

4    *Nelson* is instructive.  In *Nelson*, the Court affirmed dismissal of a retaliatory discharge claim

5    that was based on the same type of speculation advanced by Bailey here:

6         Dr. Nelson's theory appears to be…that she was constructively discharged
          because of her criticism of the college's affirmative action program.  As explained
7         above, there is no evidence in the record from which a trier of fact could have
          concluded that Dr. Nelson was discharged because she criticized the college's
8         affirmative action program.  Her claim that she did one thing, and subsequently
          the other thing happened to her, is, in the factual context of this case, insufficient
9         to allow that inference.… [A] 'scintilla' of evidence is not enough to create a
          'genuine issue of material fact' in order to preclude summary judgment.
10
11   *Nelson*, 83 F.3d at 1081-82.  Bailey's wrongful termination claim is fatally flawed in precisely

12   the same way, and like the claim in *Nelson*, should be dismissed as a matter of law.

13   **C.**     **Plaintiff's Wage Claims Fail as a Matter of Law and Should Be Dismissed**

14          Bailey has asserted three separate wage claims: (1) failure to pay overtime wages in

15   violation of the Washington Minimum Wage Act ("MWA"), RCW 49.46 *et seq.*; (2) failure to

16   pay overtime wages and willfully withholding wages in violation of the Federal Fair Labor

17   Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*; and (3) willful withholding of wages in

18   violation of the Washington Wage Rebate Act, 49.52 *et seq.*  Second Am. Compl. ¶¶ 5.4–5.9.

     All of these claims fail as a matter of law due to Bailey's status as an "exempt" employee.

19          **1.**     **Administrative Employees Are "Exempt" From Overtime Pay Requirements**

20          Under the MWA and FLSA, employers are required to pay "non-exempt" employees one

21   and a half times their regular pay rate for all hours worked in excess of forty hours per week.

22   RCW 49.46.120; 29 U.S.C. § 207.  Employees in "administrative" positions, however, are

23   exempt from this overtime pay requirement.  RCW 49.46.010(3)(c); 29 U.S.C. § 213(a)(1).

24          Under Washington law, an employee is administratively exempt if:

25          [1] she is compensated on a salary or fee basis at a rate of not less than $250 per

26   beliefs"); *White v. State*, 131 Wn.2d 1, 19-20 (1996) (it is not the courts' role "to act as super personnel agencies.").

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 15

136297748.2

week . . . and [2] her primary duty consists of the performance of office or nonmanual work directly related to management policies or general business operations of her employer or her employer's customers; [3] which includes work requiring the exercise of discretion and independent judgment…

WAC 296-128-520(4)(b); *see also* Ex. W (Washington L&I Admin. Policy ES.A.9.4) at 2.[11]  To qualify for the near-identical administrative employee exemption under the FLSA,

[1] the employee must be compensated on a salary or fee basis at a rate not less than $455 per week; [2] the employee's primary duty must be the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and [3] the employee's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.

Here, all the requirements for the "administrative" exemption are met under both the FLSA and the MWA.  First, as a Senior Buyer, Bailey was paid a salary exceeding $455 per week.  Exs. D, F, G.  Second, her primary duties—purchasing, new product development, and managing important contract manufacturers in Asia—directly related to Alpha's and Altair's general business operations.  Ex A at 27-30, 32; Exs. B, C, E; Kaiser Decl. ¶ 3; Griffith Decl. ¶ 5.  *See* 29 C.F.R. § 541.201(b) ("Work 'directly related to management or general business operations' includes . . . work in functional areas such as . . . purchasing; [and] procurement"); Ex. W (Wash. L&I Policy ES.A.9.4) § 9 ("[E]xamples of administrative operations include advising the management, planning, negotiating, representing the company, purchasing . . . .")[12]

The third element of the test—whether Bailey's primary duties involved the exercise of discretion and independent judgment—is also satisfied, as discussed below.[13]

---

[11] Because it is undisputed that Bailey was paid more than $250 per week, the "long form" test set out in WAC 296-128-520(1)-(4) is inapplicable.  Ex. A at 32-36; Ex. D; Ex. W at § 3.

[12] This administrative policy guidance issued by the Department of Labor & Industries "is entitled to substantial deference by this Court." *Reed v. City of Asotin*, 917 F. Supp. 2d 1156, 1161-62 (E.D. Wash. 2013).

[13] Given the similar standards, Bailey's exempt status can be analyzed primarily under FLSA regulations, with reference to Washington guidance on the MWA where applicable. *Roe v. Debt Reduction Servs., Inc,* 2007 WL 1266151, at *6 (E.D. Wash. Apr. 30, 2007) ("Concurrent consideration of the Plaintiff's FLSA and MWA claims is appropriate in this case because the tests for the primary duty and exercise of discretion elements of the FLSA and MWA are almost identical") (citing 29 C.F.R. § 541.200(a)(2)-(3) and WAC § 296-128-520).

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 16

136297748.2

## 2.    The "Discretion and Independent Judgment" Requirement

"To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a).  "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id*.  Factors bearing on whether an employee exercises discretion and independent judgment include, but are not limited to:

> whether the employee performs work that affects business operations to a substantial degree; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval, whether the employee has authority to negotiate and bind the company on significant matters, [and] whether the employee provides consultation . . . to management . . . .

*Id*. § 541.202(b).  "Employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." *Id.* § 541.202(c).  "Thus, the term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review." *Id.*; Ex. W (Wash. L&I Policy) at § 10.3.  "The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." *Id.*; Ex. W at § 10.3.  "The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." *Id.*; Ex. W at § 10.3.

Under this standard, government agencies and courts have long recognized buyers as administratively exempt employees.  For example, the guidance issued by the Washington Department of Labor & Industries states:

> Also included [in the administrative exemption] are persons who are in charge of a so-called functional department . . . . ***Typical examples of such employees are*** credit managers, ***purchasing agents, buyers,*** safety directors, personnel directors, and labor relations' directors.

Ex. W (Wash. L&I Policy ES.A.9.4) at § 7.2.[14]  Similarly, FLSA regulations provide:

---

[14] "The fact that there are a number of other employees . . . performing identical work does not affect the

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 17

136297748.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

2  ***Purchasing agents with authority to bind the company on significant purchases
   generally meet the duties requirements for the administrative exemption*** even if
3  they must consult with top management officials when making a purchase
   commitment . . . .

4  29 C.F.R. § 541.203(f).

5      Likewise, for over 70 years courts have routinely held that buyers are administratively

6  exempt. *See, e.g., Dolan v. Day & Zimmerman,* 65 F. Supp. 923 (D. Mass. 1946) (employee

7  responsible for purchasing tools, jigs, fixtures, and gauges for torpedo manufacture held

   administratively exempt); *Goldberg v. Arkansas Best Freight Sys., Inc.,* 206 F. Supp. 828, 832
8
   (W.D. Ark. 1962) (employee who purchased parts for repair of equipment used in the business,
9
   who exercised independent judgment in determining the type and quality of the parts to be used,
10
   held administratively exempt); *Rhule v. Pope & Talbot Co.,Inc.,* 1981 WL 2257, at *1 (D. Or.
11
   Nov. 24, 1981) ("log merchandising buyer who bought, sold, and traded logs in the mill's
12
   inventory in order to keep the proper quantity and kind of logs available for production" held
13
   administratively exempt); *Stricker v. E. Off Road Equip.,* Inc., 935 F.Supp. 650, 657 (D. Md.
14
   1996) (employee whose duties included "routine and special procurement or inventory [and]
15
   negotiating prices with dealers and purchasers of the store's merchandise" held administratively
16
   exempt); *Condren v. Sovereign Chem. Co.,* 142 F.3d 432 (6th Cir. 1998) (unpublished)
17
   (Affirming district court finding that employee was administratively exempt: "Although Condren
18
   did not have the formal title of 'purchasing agent,' the record amply supports the conclusion that
19
   Condren purchased the MLPC product line, and eventually all of Sovereign's chemicals.  Thus, .
20
   . . his purchasing duties performed without the title of purchasing agent nonetheless constituted
   exempt administrative work.").
21
       Given its factual similarity to aspects of this case, *Condren* is particularly instructive, on
22
   both the second and third elements of the administrative exemption requirements.  With respect
23
   to the second requirement—duties directly related to general business operations—the court
24
   explained that, "exempt work need not entail the formulation of policy, but includes work that
25

26  determination . . . so long as the work of each such employee is of substantial importance to the . . . operation of the
   business."  Ex. W (Wash. L&I Policy) at § 9.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 18

136297748.2

'affects business operations to a substantial degree.'"  142 F.3d at *3.[15]  Because the plaintiff was engaged in purchasing for an important product line, and engaged in "daily juggling of the logistics (timing, shipping, payment) incident to importing [that] product line," the court held "as a matter of law" that his duties were directly related to the general business operations of his employer.  *Id.*  Likewise, on the third requirement—independent judgment and discretion—the court found that the plaintiff's role required "daily discretionary decisions regarding the logistics of importing the MLPC product line," including "forecasting how much product to order, when to order it, how to ship it, and how to pay for it."  *Id.*  Under these circumstances, where the plaintiff "routinely compared and evaluated possible courses of conduct," the requirement of independent judgment and discretion was easily met.  142 F.3d at *3-4.

### 3. Bailey's MWA and FLSA Claims Fail Because She Was Properly Classified as Administratively Exempt

In this case, as in *Condren*, Bailey's position as a Senior International Buyer satisfied all the requirements for the administrative exemption.  Thus, her claims for overtime pay under the MWA and FLSA fail as a matter of law.

#### a. Bailey Was Paid a Salary in Excess of $455 Per Week

As noted above, it is undisputed that at all relevant times, Bailey earned a salary of more than $455 per week.  Exs. D, F, G; Rice Decl. ¶¶ 7-8.

#### b. Bailey's Primary Duties as a Senior Buyer Related Directly to the General Business Operations of her Employers

Nor can there be any reasonable dispute that Bailey's primary duties as a Senior International Buyer related directly to Altair's and Alpha's general business operations.  Bailey's own testimony establishes that her work was of substantial importance in procuring the components and finished products that Altair and Alpha needed to serve their customers: "I worked with engineering to roll out new products and cost them. . . . . I [also] worked on . . . released items, or mature product in its life cycle. . . . I managed the contract manufacturers that were located in Asia . . . . [a]nd all of the aspects that go with managing a contract manufacturer

---

[15] Citing language now codified in 29 C.F.R. § 541.202(b).

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 19

136297748.2

1  in another country. . . . I managed the build of materials, the costing of those build materials.  I

2  had to make sure we met our customer delivery dates with products to the production floor, the

3  logistics, arranging delivery."  Ex. A at 28.  Bailey further testified that she would "[d]evelop

4  sources of supply," "evaluate each purchase requisition . . . and after determining it was valid,

5  then determine the most appropriate method of procurement," "look[ ] for the most appropriate

6  cost-effective quality product," and "negotiate price reductions."  Ex. A at 43-48; *see also* Kaiser

7  Decl. ¶ 3 ("Alpha products could not be built by Altair without the parts that Ms. Bailey was

8  instrumental in procuring at competitive prices"); Griffith Decl. ¶¶ 5-7 (same); Rice Decl. ¶ 8.

9        As in *Condren*, these undisputed facts satisfy the second requirement for the

10 administrative exemption as a matter of law.  142 F.3d at *2-4.

                **c.**    **Bailey Exercised Discretion and Independent Judgment with Respect**
11                       **to Matters of Significance**

12       Bailey's testimony likewise establishes that she exercised discretion and independent

13 judgment on matters of significance in the exercise of her duties.  For example, in developing

14 sources of supply, Bailey testified that she "would compare and evaluate suppliers" "based on

15 lots of different criteria, depending on what the need was."  Ex. A at 45.  As noted above, she

16 would also "evaluate the purchase requisition to make sure the need is valid, . . . [and] then

17 determine the most appropriate method of procurement."  *Id*. at 47.  A key objective she pursued

18 was "on-time delivery," and "[t]here's lots of criteria that go into to that."  *Id*. (Q: "And you'd be

19 managing and evaluating this?  A: Yes.").  Bailey's judgment calls on delivery method often had

20 significant cost implications.  Griffith Decl. ¶ 6.  Bailey also routinely represented her employer

21 on calls with contract manufacturers on engineering, design, supply and logistical issues, and

22 was deeply involved in price negotiations.  Ex. A at 30-32, 94, 120-21; Kaiser Decl., Exs. 1, 2.

23 In addition, as a Senior Buyer, Bailey had independent authority to commit the company to

24 significant purchases of up to $10,000, "based solely on her judgment and experience about how

25 and when to procure such material on the best possible terms."  Griffith Decl. ¶ 6; Ex. X

26 (Griffith dep.) at 166-67; *id*. at 92-93 ("she did this on her own.  She was a very accomplished

27 buyer and negotiator, and she wanted the credit for realizing the savings.").  As Bailey testified,

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 20

136297748.2

these exercises of discretion were among "all of the aspects that go with managing a contract manufacturer in another country."  Ex. A at 28; Ex. X (Griffith dep.) at 95-96.

Bailey's supervisor at Altair (who continued to work with her closely when she was at Alpha in 2015) described her authority and exercise of independent judgment as follows:

> [S]he had the authority to—in her conference calls, to make a lot of decisions.
>
> She would stop a shipment.  She would authorize them to buy parts on the spot market for a product.  She would sign NCNR [non-cancelable, non-returnable] agreements for things we were obligated to do.  She would change the mode of transportation if we needed to air—for instance, we had a part that failed in their lab, and she felt we needed to air that part in so we could immediately take a look at it before the entire shipment was made.  She had the capacity to do that.
>
> So there was a lot of independent judgment.

Ex. X (Griffith dep.) at 121; Griffith Decl. ¶¶ 6, 7 (listing areas of authority and discretion).

Here again, as in *Condren*, these undisputed facts satisfy the third requirement for the administrative exemption.  142 F.3d at *2-4.  Accordingly, Bailey was properly classified as exempt, and her wage claims fail as a matter of law.

**4.      Defendants Have Not Willfully Withheld Wages Due to Plaintiff**

Bailey also brings a claim for wrongful withholding of wages under Washington's "wage rebate" statute, RCW 49.52 *et seq*.  This is a derivative claim, based on the same facts as the MWA and FLSA claims (*i.e.*, Bailey's contention that she should have been paid for overtime hours, including alleged "on-call" hours).  Second Am. Compl. ¶¶ 4.10-4.13.  To prevail on this claim, Bailey must prove that (1) Alpha and Altair failed to pay her wages that were due, which (2) were withheld "willfully," rather than through error or a bona fide dispute as to whether they were, in fact, owed.  *See, e.g.*, *Morrison v. Basin Asphalt Co.*, 131 Wn. App. 158, 163 (2005).

Here, because Bailey's claims for overtime pay (including for "on-call" hours) fail due to her status as an "exempt" employee (*see supra* § III.C.1-3), her claim for willful withholding of wages necessarily fails as well.

**D.      Plaintiff's Defamation Claim Should Be Dismissed**

"In Washington, a defamation plaintiff must show four essential elements: [1] falsity,

1
2
3
4
5

[2] an unprivileged communication, [3] fault, and [4] damages." *Doe v. Gonzaga Univ.*, 143 Wn.2d 687, 701 (2001), *rev'd on other grounds*, 536 U.S. 273 (2002).  Bailey's defamation claim fails because (1) she cannot produce any competent evidence of a defamatory statement attributable to Defendants; (2) her vague allegation describes a statement of opinion, not a fact provable as false; and (3) the alleged statement was privileged.

6

### 1.      Plaintiff Cannot Prove Any Defamatory Statement Was Made

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Here, Bailey vaguely asserts that Defendants informed Bailey's coworkers that she was "terminated because she was a 'security risk.'"  Second Am. Compl. ¶ 5.11.  Yet, at her deposition, Bailey could not identify who informed her of the alleged statement, nor any details regarding what was said, when, and to whom.  Ex. A at 334-40.  She "thinks" the statement, which was reported to her in a grocery store by an unidentified former coworker, was attributable to Mr. Kaiser.  *Id*. at 338-9.  That is the totality of her evidence of defamation in this case. Bailey's account is rebutted, however, by a former coworker, David McKee, who testified that he saw Bailey in a grocery store and said, jokingly, "should I be afraid of you?"  Ex. R at 69-71. He went on the explain that he posed the question facetiously because he had seen signs posted on certain doors at Alpha saying "Keep Doors Closed," or words to that effect.  *Id*. at 70-71, 74. McKee testified that he never heard Kaiser, Borsari or any other Alpha or Altair employee make any statement about Bailey being a "security risk," or indeed, any statement at all about the reasons for Bailey's termination.  *Id*. at 60, 75.  Because Bailey has no competent evidence that any Defendant described her as "a security risk," her defamation claim must be dismissed.  *See Goehring v. Wright,* 858 F. Supp. 989, 1005 n. 52 (N.D. Cal. 1994) (dismissing defamation claim as a "creature of unadulterated speculation," when plaintiff did not overhear the alleged conversations and provided no evidence that any statement about him was made).

23

### 2.      The Alleged Statement Is An Opinion, Not a Fact Provable as False

24
25
26

Even if Bailey could prove through competent and admissible evidence that one of the Defendants said she was a "security risk"—which she cannot—such a statement is, at best, a nonactionable statement of opinion, which cannot be proven false.  A statement must be provable

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 22

136297748.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

as false before there can be liability under Washington defamation law.  *Haueter v. Cowles Publ'g Co.*, 61 Wn.App. 572, 586-97 (1991) (affirming summary judgment in part because the alleged description of the plaintiff organization as a "phony front" was not provable as false).  Any alleged statement that Bailey was a "security risk" is a statement of opinion.  *Jacques v. Bank of Am. Corp.*, 2014 WL 7272769, at *9 (E.D. Cal. Dec. 18, 2014), *report and recommendation adopted*, 2015 WL 224736 (E.D. Cal. Jan. 15, 2015) (granting a motion to dismiss, in part, because "Plaintiff's allegation that [his employer] published a report indicating that Plaintiff presented a security risk appears to be a statement that is not provably false, as it appears to be an opinion regarding Plaintiff's trustworthiness"); *Mehta v. Fairleigh Dickinson Univ.*, 530 F. App'x 191, 198 (3d Cir. 2013) (faculty member's statement that he believed a doctoral student in the university's psychology program was a " threat to public safety" was mere opinion, and therefore, not actionable as defamation).

### 3.        The Alleged Statement Is Privileged

Statements that would otherwise be defamatory incur no liability if they are "privileged." *Moe v. Wise*, 97 Wn. App. 950, 957 (1999).  The court determines the existence of privilege as a question of law.  *Id.* at 958.  Courts recognize a "common interest" privilege that is "available generally for persons involved in the same organizations, partnerships, associations, or enterprises who are communicating on matters of common interest."  *Id.*  The privilege arises "when parties need to speak freely and openly about subjects of common organizational or pecuniary interest."  *Id.* at 959.  Washington courts consistently apply the privilege to dismiss defamation claims based on communications made in the workplace.  *See, e.g., Lambert v. Morehouse*, 68 Wn. App. 500, 506 (1993) (statements accusing employee of sexual harassment were privileged); *Henderson v. Pennwalt Corp.*, 41 Wn. App. 547, 558 (1985) (statements related to plaintiff's ability to perform her job were privileged).

Here, the undisputed facts establish that Mr. McKee simply had a general conversation with another coworker about keeping certain doors closed at the Alpha facility.  Communications regarding workplace safety are privileged.  *See e.g.*, *Jarzynka v. St. Thomas Univ. of Law*, 310 F.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 23

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Supp. 2d 1256, 1267 (S.D. Fla. 2004) (remarks by school counselor to the dean, indicating that a law student posed a threat to the safety of the school community, were privileged); *Slovinec v. Am. Univ.*, 565 F. Supp. 2d 114, 119 (D.D.C. 2008), *aff'd*, 2009 WL 1201574 (D.C. Cir. Jan. 29, 2009) (even if notice issued by university barring plaintiff from campus contained a false or defamatory statement, university's dissemination of the notice was privileged under the common interest privilege; university personnel issued the notice in good faith and shared it only with personnel charged with protecting staff and students). For this reason, even if Bailey's vague, unsupported allegation is taken as true, such a communication is privileged because the statement was directed to Alpha employees and concerned workplace safety issues.

**E.**     **Defendant Grace Borsari Is Entitled to Recover on Her Breach of Contract Claim**

Over the course of Bailey's employment, Defendant Grace Borsari provided Bailey multiple personal loans, which were memorialized in a series of simple Promissory Notes. Ex. T. As explained above (§ II. D), Bailey is now in breach of three of those Promissory Notes, representing $6,400 in unpaid principal, plus interest. By letter to Bailey's counsel dated April 18, 2016 (Ex. U), Borsari provided notice of her demand for payment in full of all amounts due under each of the three Notes. Following the expiration of the 30-day period for repayment, with no payment received from Bailey, all principal and interest became due immediately pursuant to the Acceleration clause in paragraph 5 of each of the Notes. Bailey acknowledges that she borrowed the money, signed each of the Notes, and has not repaid any of the amounts due under the Notes. Ex. A at 271-75. The Promissory Notes are enforceable contracts, which Bailey has breached. Borsari is therefore entitled to judgment on her breach of contract counterclaim (Dkt. #31), and an award of damages in the amount of $6,400 (plus interest, costs and attorneys' fees).

## IV.     CONCLUSION

For the reasons set forth above, the Court should grant summary judgment in favor of Defendants, dismissing all of Plaintiff's claims with prejudice. In addition, the Court should grant summary judgment in favor of Defendant Borsari on her claim for breach of the Promissory Notes. Defendants have submitted a Proposed Order to that effect.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 24

136297748.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

2

3
DATED: July 27, 2017                    By: _s/ Joseph M. McMillan_____

4
                                        Kevin J. Hamilton, WSBA #15648
                                        Joseph M. McMillan, WSBA #26527
5                                       Tobias S. Piering, WSBA #44560

6                                       Attorneys for Defendants Alpha Technologies
                                        Inc., Altair Advanced Industries, Inc., Fredrick
7                                       Kaiser, and Grace Borsari

8                                       **Perkins Coie LLP**
                                        1201 Third Avenue, Suite 4900
9                                       Seattle, WA  98101-3099
                                        Telephone: 206.359.8000
10                                      Facsimile:  206.359.9000
                                        Email:  KHamilton@perkinscoie.com
11                                                JMcMillan@perkinscoie.com
                                                  TPiering@perkinscoie.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(No. 2:16-cv-00727-JCC) – 25

136297748.2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that, on July 27, 2017, I electronically filed the

foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the

Court using the CM/ECF system, which will send notification of such filing to the following:

**Patrick Leo McGuigan**
**William Kim**
HKM Employment Attorneys LLP
600 Stewart Street, Suite 901
Seattle, WA 98101

☐  United States Mail, First Class

☐  By Messenger

☐  By Facsimile

☒  By ECF

I certify under penalty of perjury that the foregoing is true and correct.

DATED this 27th day of July, 2017.

*s/ Roxann Ditlevson*
Roxann Ditlevson
Legal Secretary

CERTIFICATE OF SERVICE (No. ) – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

136297748.2