THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| YVETTE BAILEY, | CASE NO. C16-0727-JCC |
| Plaintiff, | ORDER |
| v. | |
| ALPHA TECHNOLOGIES INCORPORATED, *et al.*, | |
| Defendants. | |

This matter comes before the Court on Defendants' motion for summary judgment (Dkt. No. 48) and motion to strike evidence (Dkt. No. 57 at 12–13). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary, and, for the reasons explained herein, GRANTS in part and DENIES in part Defendants' motion.

## I.    BACKGROUND[1]

Yvette Bailey ("Bailey") filed this suit against Defendants, her former employers, alleging wrongful discharge, failure to pay overtime wages as required by state and federal law, willful withholding of wages, defamation, and emotional distress claims. (Dkt. No. 1 at 10–12.) Upon Defendants' prior motion, the Court dismissed Bailey's emotional distress claims. (Dkt. No. 10; Dkt. No. 16 at 11–15.) Defendant Grace Borsari ("Borsari") subsequently

---

[1] This section presents the facts in the light most favorable to the non-moving party (Bailey).

counterclaimed for breach of contract. (Dkt. No. 23.) Bailey has voluntarily dismissed her defamation claim. (Dkt. No. 53 at 3.) Defendants now seek summary judgment on all remaining claims. (Dkt. No. 48.)

Altair Advanced Industries, Inc. ("Altair") and Alpha Technologies, Inc. ("Alpha") are privately held companies owned and headed by Borsari and Defendant Fredrick Kaiser ("Kaiser") respectively. (Dkt. No. 50 at 1–2.) Telecomponents & Supply, Ltd. ("TCS") is a purchasing agent for Altair, and is wholly owned by Kaiser. (Dkt. No. 50 at 1.) Bailey worked for Defendants Altair and Alpha for more than 25 years before her employment was terminated in August 2015. (Dkt. No. 54 at 2.) Bailey was a senior international buyer, whose duties included "negotiating the purchase price of components, sub-assemblies, and finished products with the contract manufacturers in Asia (mostly China)." (*Id.* at 3.)

Bailey's primary responsibility as a purchaser was to negotiate the price of parts from contract manufacturers. (*Id.* at 6.) She would then relay the negotiated price to TCS and TCS would purchase the parts at that price. (*Id.* at 3.) The prices that TCS was willing to pay for goods were set by TCS, and Bailey had no discretion or authority over what TCS was willing to pay. (*Id.* at 4.) Once TCS purchased the parts, they were sold to Altair at a markup. (*Id.*)

Bailey was aware of the higher prices that Altair would pay for the same goods she had negotiated to buy for less. (*Id.*) Kaiser told Bailey that the markup between the negotiated price that TCS paid and the price Altair paid should not exceed 20–25% because there would be adverse tax consequences that could get the company in trouble with the IRS. (*Id.* at 5.) As one of the only people with access to both price lists, Bailey reviewed the lists to make sure the markups did not exceed the designated percentages. (*Id.*)

In January 2015, Bailey discovered that some of the markups recorded on the TCS price list were 50–60% higher than the price she had negotiated. (*Id.*) Bailey reported the discrepancy to Borsari who in-turn notified Kaiser. (*Id.*) Borsari insisted Bailey delete any email correspondence about the high markup and ensure other recipients did also. (*Id.*) In a later in-

person meeting, Kaiser and Borsari reminded Bailey not to disclose the markup concerns, and told Bailey that it was "unfortunate" she knew the information. (*Id.*) In that meeting, Kaiser and Borsari told Bailey she would be transferred from Altair to Alpha. (*Id.* at 10.) She moved offices and received a raise, but, her job duties did not change. (*Id.*)

Bailey did not understand the move because she had been doing the same work for Altair for years, and found it odd she was moved immediately after reporting the high markups. (*Id.*) In July 2015, TCS released a new price list which again showed markups of 50-60%. (*Id.*) Bailey again reported the markups, but this time Kaiser insisted that Bailey travel with him to the Bahamas to meet with Peter Turnquest, a TCS employee, to fix the price list. (*Id.*) Kaiser also asked Bailey to bring her husband. (*Id.* at 12.) Bailey found both requests odd because she had met Turnquest before and thought the issue could be sorted out over the phone. (*Id.* at 11–12.)

In the Bahamas, during a brief meeting, Kaiser instructed Bailey and Turnquest to review the price list. (Dkt. No. 54 at 12.) Turnquest instead had an associate work with Bailey on the price list. (*Id.*) This was the only meeting Bailey attended in the Bahamas, and she was otherwise free to do what she pleased. (*Id.*) Days after returning, Kaiser received an email from Turnquest alleging Bailey and her husband had solicited drugs at their hotel while making "outlandish" claims about Turnquest and TCS. (Dkt. No. 50 at 16.)  Days later, Kaiser fired Bailey. (*Id.*) Bailey was not given an opportunity to explain herself. (Dt. No. 54 at 14.) Kaiser claims he terminated Bailey's employment because of the content of the email, and Turnquest's insistence that he no longer wanted to work with Bailey. (Dkt. No. 50 at 16.) Bailey denies Turnquest's allegations and believes they were fabricated to allow Kaiser to fire her. (Dkt. No. 54 at 14–15.)

Separate from Bailey's termination, in 2013 and 2014, Borsari loaned Bailey $6,400 using several promissory notes. (Dkt. No. 52 at 223–226.) Each promissory note contained an acceleration clause that allowed Borsari the option to collect the outstanding loan balance in full if Bailey became delinquent. (*Id.* at 223–226.) When Bailey was unable to pay the loans when they became due, Borsari told her to pay when she could. (Dkt. No. 54 at 17.) After Bailey filed

this lawsuit, Borsari sent her a letter requesting payment in full. (Dkt. No 56-3 at 70.) Bailey has still made no payments on any of the loans. (*See* Dkt. No. 54 at 17.)

## II. DISCUSSION

### A. Summary Judgment Standard

The Court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party must present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248-49. Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### B. Motion to Strike Evidence

As an initial matter, the Court addresses Defendants' motion to strike all evidence mentioned in Plaintiff's response brief regarding the Defendants' 2004 criminal tax case.[2] (Dkt. No. 57 at 12–13.) Defendants ask this Court to strike the evidence as irrelevant and improper "other acts" evidence in violation of Federal Rules of Evidence 402 and 404(b), or in the alternative, as unfairly prejudicial under Rule 403. (*Id.*)

The Court has not considered that evidence in making its decision on Defendants'

---

[2] Defendants first raised this issue in the final section of their reply brief. (Dkt. No. 57 at 12–13.) The Court did not order, and the Plaintiff has not provided, a surreply to this issue.

summary judgment motion. Even without considering that evidence, the Court finds that the Plaintiff has presented evidence that creates a genuine dispute of material fact as it relates to her wrongful termination claim. The Defendants' motion to strike is therefore DENIED without prejudice. Defendants can bring their motion again prior to trial.

### C. Bailey's Wrongful Termination Claim

"The tort for wrongful discharge in violation of public policy is a narrow exception to the at-will doctrine." *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081 (Wash. 1984). "To state a cause of action, the plaintiff must plead and prove that his or her termination was motivated by reasons that contravene an important mandate of public policy." *Id.* In Washington, it is generally accepted that wrongful discharge claims are limited to four public policy concerns:

> (1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistle blowing.

*Becker v. Cmty. Health Sys., Inc.*, 359 P.3d 746, 749 (Wash. 2015). "Under each scenario, the plaintiff is required to identify the recognized public policy and demonstrate that the employer contravened that policy by terminating the employee." *Rose v. Anderson Hay & Grain Co.*, 358 P.3d 1139, 1142 (Wash. 2015).

For wrongful dismissal claims, Washington uses a burden-shifting framework. *Id.* "The first step is for a plaintiff to make out a prima facie case for retaliatory discharge. To do so, a plaintiff must show that protected activity was 'a cause' of his or her termination." *Rickman v. Premera Blue Cross*, 193 Wash. App. 1048, at *3 (2016). "Causation in a wrongful discharge claim is not an all or nothing proposition. The employee need not attempt to prove the employer's sole motivation was retaliation." *Rickman v. Premera Blue Cross*, 358 P.3d 1153, 1160 (Wash. 2015). Indeed, an employee must only produce evidence, circumstantial or otherwise, "that the actions in furtherance of public policy" were "a substantial factor motivating the employer to discharge the employee." *Id.*

If the employee presents a prima facie case, the burden shifts to the employer to offer a nonretaliatory reason for terminating the employee. *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 821 P.2d 18, 28 (Wash. 1991). If the employer provides a legitimate reason for termination, the burden shifts back to the employee to offer evidence to show that the nonretaliatory reason was pretextual. *Rickman*, 193 Wash. App. at *3. "For summary judgment purposes, this is a burden of production, not persuasion, and the plaintiff need only offer sufficient evidence to create a genuine issue of material fact." *McFarland v. BNSF Ry. Co.*, 2017 WL 2218332, at *3 (E.D. Wash. Feb. 2, 2017) (citation omitted). An employee may show "that the [proffered] reason has no basis in fact, it was not really a motivating factor for the decision," or that retaliation was a substantial motivating factor. *Id.* at 547. "The employee is not required to produce evidence beyond that already offered to establish a prima facie case." *Scrivener v. Clark Coll.*, 309 P.3d 613, 617 (Wash. Ct. App. 2013) (*rev'd on other grounds*).

1. Bailey's Prima Facie Case

Bailey alleges she was fired in retaliation for bringing to light conduct that could have had negative tax consequences for Defendants. (Dkt. No. 20 at 2.) The parties agree that Bailey's claim falls within the recognized public policy category of whistleblowing. (Dkt. No. 48 at 14–15, Dkt. No. 53 at 17.) It is generally accepted that activities in violation of a statute or law are in contravention of public policy. *See Dicomes v. State*, 782 P.2d 1002, 1007 (Wash. 1989) (holding that Washington courts "consider whether the employer's conduct constituted either a violation of the letter or policy of the law" when determining "whether a discharge contravenes the public policy of protecting employees who report employer misconduct").

To establish that her actions were in furtherance of a public policy concern, Bailey relies on her belief that the markups she reported could have gotten the Defendants in trouble with the IRS. (Dkt. No. 53 at 17–18.) She cites the federal tax code to support her argument that compliance with tax laws is a public policy concern. (*Id.*) Bailey provided evidence that when she first reported the excessive markups Kaiser told her there could be adverse tax implications

1  and that the company could get in trouble with the IRS. (Dkt. No. 53 at 5–6.) After reporting,
2  Kaiser instructed Bailey to delete the email referencing the markups, to tell another employee to
3  delete the email and not to speak to anyone else about it. (Dkt. No. 54 at 9–10.)

4  When Bailey reported markups for a second time, she had already been warned by Kaiser
5  that markups might have negative tax implications. (*Id.* at 11.) Although Bailey never used the
6  terms "tax fraud" or "tax evasion" when she reported the discrepancy, she reported the markups
7  because she didn't want Defendants to get in trouble with the IRS. (*Id.* at 15.) Viewing all facts
8  and justifiable inferences in the light most favorable to Bailey, the Court finds that she believed
9  she was reporting information that could have been a potential violation of federal tax law, which
10 would represent conduct in contravention to public policy.

11 As to causation, Bailey provided circumstantial evidence to support her argument that
12 reporting the markups was a significant factor in her termination. (*See* Dkt. No. 54 at 9–14.)
13 Bailey's argument relies on reasonable inferences that can be drawn when considering the series
14 of events that transpired once she reported the markups, the behavior of Borsari and Kaiser in
15 response to her reporting, and the explanations provided for such behavior. (*Id.*) When Bailey
16 first discovered excessive markups and reported them to Defendants, they told her to keep that
17 information to herself. (*Id.*) Kaiser instructed Bailey to delete any related emails and to make
18 sure anyone else she emailed about the discrepancy deleted the email as well. (*Id.*) Bailey was
19 told it was "unfortunate" she knew the information and that the markups could get the
20 Defendants in trouble with the IRS. (*Id.*) Bailey was one of two people, other than Kaiser, who
21 had access to the pricelist showing the markups. (Dkt. No. 53 at 21.) Defendants almost
22 immediately transferred Bailey to report directly to Kaiser. (Dkt. No. 54 at 14.)

23 When Bailey pointed out markups for a second time in July 2015, Kaiser initiated a series
24 of unusual events that quickly led to her termination. (*Id.* at 11–14.) After reporting the markups:
25 (1) Bailey and her husband were taken to the Bahamas by Kaiser; (2) Bailey was told the trip
26 was to conduct business with Turnquest that could be done over the phone; (3) She spent only a

ORDER
PAGE - 7

1  few minutes with Turnquest and spent minimal time on the purported issue for which the trip
2  was taken; (5) Bailey was fired days after returning based on an email Turnquest sent to Kaiser
3  alleging unspecific claims about Bailey, of which neither man had first-hand knowledge; and (6)
4  She was not given an opportunity to explain herself before being fired. (*Id.* at 11–14; Dkt. No. 52
5  at 183; Dkt. No. 52 at ) Bailey was terminated the month after reporting the excessive markups.
6  (*Id.*) This sequence of events allows for a reasonable inference that Bailey's continued reporting
7  of the markups was a substantial factor in her firing.

8        2. Defendants' Nonretaliatory Reason

9        It is undisputed that Defendants have offered a nonretaliatory reason for firing Bailey.
10 (Dkt. No. 48 at 16, Dkt. No. 53 at 21.) Defendants allege Bailey was fired because of the
11 "extremely damaging content of the email [from Turnquest], which reflected an irremediable
12 rupture in the relationship between Ms. Bailey and TCS's then-Managing Director." (Dkt. No 50
13 at 6.) However, Bailey argues the reason is entirely pretextual. (Dkt. No. 53 at 21.)

14       3. Bailey's Argument for Pretext

15       In addition to the evidence presented for her prima facia case—all of which can be
16 considered for establishing pretext—Bailey disputes Defendants' nonretaliatory reasons for
17 firing her. Bailey and her husband deny all of the statements made by Turnquest in his email to
18 Kaiser. (Dkt. No. 54 at 14–15, Dkt. No. 53 at 21.) After Bailey was told she was being
19 terminated, Kaiser refused to let her defend herself against any allegations and denied her the
20 opportunity to take a drug test, despite being accused of soliciting drugs. (Dkt. No. 54 at 14.)

21       Additionally, Kaiser informed Bailey that she could no longer perform her job functions
22 because no one at TCS was willing to work with her. (*Id.*) However, Bailey points out that
23 Kaiser owns TCS and is likely the one who dictates business relationships. (Dkt. No. 53 at 21.)
24 Also, Kaiser made no efforts to move Bailey to a different department which would prevent her
25 from interacting with TCS. (*Id.*) Bailey argues that there is an inference of pretext based on the
26 Defendants' actions each time she reported an excessive markup and Defendants' reliance on

unsubstantiated information in deciding to fire her. (*See* Dkt. No. 53 at 21.)

The Court again considers Bailey's evidence of pretext against the Defendant's basis for terminating her employment. Kaiser's primary basis for firing Bailey—an employee with 26 years of service with Altair and Alpha—was an email from Turnquest containing claims about Bailey's unprofessional behavior in the Bahamas—claims of which neither man had firsthand knowledge. (Dkt. No 52. at 183, 192, 197.) Viewing these facts and all justifiable inferences in the light most favorable to Bailey, the Court finds that there are genuine issues of material fact as to whether or not Defendants' nonretaliatory reason for terminating Bailey was pretextual. Accordingly, Defendants' motion for summary judgment on Bailey's wrongful termination claim is DENIED.

### D.     FLSA and MWA Claims

Defendants contend they are entitled to judgment as a matter of law on Bailey's overtime claims because Bailey was correctly classified as an exempt employee. (Dkt. No. 48 at 17.) Bailey asserts that she was misclassified as administratively exempt and thus owed overtime wages wrongfully withheld during her tenure working for Defendants. (Dkt. No. 53 at 22.)

Under the Federal Fair Labor Standards Act ("FLSA") and the Washington Minimum Wage Act ("MWA") employers are required to pay overtime wages for "non-exempt" employees who work in excess of 40 hours a week. 29 U.S.C. § 207, Wash. Rev. Code § 49.46.120. However, both Acts exempt persons who are employed in a "bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1), Wash. Rev. Code § 49.46.130(1). Exemptions under the FLSA and MWA are narrowly construed against the employer. *Stahl v. Delicor of Puget Sound, Inc.*, 64 P.3d 10, 12 (Wash. 2003); *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002). Thus, the employer bears the burden of showing that exemption applies. *Id.* Whether an employee's duties exclude her from the overtime benefits of the FLSA is a question of law appropriate for determination on summary judgment. *Bothell*, 299 F.3d at 1124.

Under the FLSA and MWA, an employee is administratively exempt if, in addition to

other factors[3], the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3); Wash. Admin. Code § 296-128-520(4)(b). Because the MWA was modeled after the FLSA, and the exemption "primary duty" tests are nearly identical, FLSA regulations are instructive when considering MWA as well. *Roe v. Debt Reduction Servs., Inc.*, 2007 WL 1266151, at *6 (E.D. Wash. Apr. 30, 2007). An employee exercises discretion and independent judgment when he or she makes a decision after comparing and evaluating all potential courses of conduct. 29 C.F.R. § 541.202(a). When determining whether an employee exercised "discretion and independent judgment" as to "matters of significance" the court should consider the following factors:

> whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree . . . whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters

29 C.F.R. § 541.202(b).

Defendants argue that Bailey, as a senior international buyer, falls squarely into the category of an administratively exempt employee based on the applicable regulations. (Dkt. No. 48 at 21.) In response, Bailey argues that she possessed limited discretion because her work was largely guided by her supervisors. (Dkt. No. 53 at 8.) The Court believes that the undisputed facts establish that Bailey was properly classified as an administratively exempt employee.

There is no dispute about Bailey's primary duties. As a senior international buyer, Bailey's main role was to negotiate the prices of materials that Altair used to make its products. (Dkt. No. 54 at 3.) ("My primary role as the senior international buyer for Altair was to negotiate the purchase price of components. . .) Bailey coordinated with contract manufacturers and TCS to ensure cost effective procurement and delivery of products. (*Id.* at 3–4.) Nor is there a genuine

---

[3] The parties are in agreement that Bailey's work satisfied the first two requirements of the administrative exempt test for both the FLSA and MWA. (Dkt. No. 53 at 23, Dkt. No. 48 at 18.)

dispute about whether Bailey's duties dealt with matters of significance—as both parties acknowledge, Bailey dealt with critical aspects of Defendants' multinational businesses. (*See* Dkt. No. 53 at 8.) ("Bailey's work was important.") (Dkt. No. 49 at 3.) (Bailey's job dealt with "multiple areas of significance to both of those companies.") The only dispute, is whether Bailey exercised discretion and independent judgment in her role as a senior international buyer.

Viewing the undisputed facts in light of the applicable regulations demonstrates that Bailey was properly classified as administratively exempt. Bailey compared and evaluated different courses of conduct by choosing the method of delivery for the products she negotiated to buy. (Dkt. No 49 at 3.) She carried out major assignments in conducting the operations of the business by negotiating directly with contract manufacturers to obtain the materials Altair needed to build its products. (Dkt. No. 54 at 3.) Bailey had authority to commit the Defendants to matters of significant financial impact based on her unfettered discretion to purchase up to $10,000 of production inventory materials from outside manufacturers. (Dkt. No. 49 at 3.) She would negotiate, agree to, and sign non-cancelable, non-returnable ("NCNR") agreements that would make Altair and Alpha obligated to contract manufacturers. (Dkt. No. 52 at 373.)

Indeed, Bailey's job template is closely analogous to the description of a "purchasing agent" as defined by the federal regulations. 29 C.F.R. § 541.203(f). In its administrative exemptions examples section, the Department of Labor specifies that "[p]urchasing agents with authority to bind the company on significant purchases generally meet the duties requirements for the administrative exemption even if they must consult with top management officials when making a purchase commitment for raw materials in excess of the contemplated plant needs." *Id*.[4] Courts are to give deference to the interpretation of FLSA regulations by the agency charged with its administration. *See Bratt v. Cnty. of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir.1990).

Bailey points out that in some aspects of her job she did not exercise discretion and

---

[4] Defendant's point to a similar Washington State regulation that includes "purchasing agents" and "buyers" as examples of administratively exempt employees. (Dkt. No. 48 at 19.)

independent judgment. (*See* Dkt. No. 53 at 7–8.) Bailey did not choose which products to buy and was limited to negotiate with only certain vendors. (Dkt. No. 54 at 6.) She had to seek a supervisor's approval to deviate from certain purchase prices. (*Id*. at 7.) Final purchase prices were constrained by the TCS price list. (*Id*.) Bailey argues that she merely applied well-established techniques and procedures dictated to her by company policy. (*Id*. at 24.)

Just because Bailey's discretion was limited by policy and supervisors in some areas of her job does not mean she did not exercise discretion and independent judgment in other aspects of her work. Bailey has not rebutted the fact that in the areas of negotiation, procurement, and delivery of products discussed *supra*, she was not constrained by her supervisors. (Dkt. No. 49 at 3.) Even if she was required to seek management's approval in some aspects of her work, she still possessed autonomy to make decisions within her sphere of authority. (*Id*. at 3–5.) Moreover, Bailey misstates the applicable standard when she frames the issues as "whether [she] exercised *sufficient* independent judgement and discretion to qualify for the administrative exemption." (Dkt. No. 53 at 23) (emphasis added). The relevant question is whether Bailey's primary duties *included* the exercise of discretion and independent judgment, not the degree to which she exercised discretion or independent judgment. 29 C.F.R. § 541.200(a)(3).

When viewing the facts in the light most favorable to Bailey, there is no genuine dispute of material fact as to whether her primary duties involved the exercise of discretion and independent judgment as to matters of significance—they did. Therefore, the Defendants have met their burden of establishing that Bailey was administratively exempt, as a matter of law, and the Court GRANTS Defendants' motion as to the FLSA and MWA claims.

**E.     Wrongful Withholding of Wages**

Defendants contend they are entitled to judgment as a matter of law on the willful withholding of wages claim because Bailey was an administratively exempt employee under FLSA and MWA and, as such, there were no overtime wages that could have been wrongfully withheld. (Dkt. No. 48 at 17.) The claim is effectively derivative of the wage claims. (*Id*. at 23.)

Given that the Court has ruled for Defendants on the wage claims, the Court GRANTS Defendants' motion on the willful withholding claim.

### F. Breach of Contract Counterclaim

Defendant Borsari moves for summary judgment on her breach of contract counterclaim. (Dkt. No. 48 at 26.) Bailey borrowed a total of $6400 from Borsari via four signed promissory notes, entered from October 2013 to June 2014. (Dkt. Nos. 54 at 17, 56-3 at 55–70.) Bailey has not repaid any of the money. (Dkt. No. 56-3 at 55–70.) The parties now disagree whether Borsari waived her rights under the promissory notes and is in breach of her obligations under the notes.

"Waiver is an intentional and voluntary relinquishment of a known right." *Panorama Residential Protective Ass'n v. Panorama Corp. of Washington*, 640 P.2d 1057, 1060 (Wash. 1982). "Waiver can be unilateral and without consideration." (*Id.*) However, "to constitute a waiver, other than by express agreement, there must be unequivocal acts or conduct evincing an intent to waive. Intent cannot be inferred from doubtful or ambiguous factors." *Wagner v. Wagner*, 621 P.2d 1279, 1284 (Wash. 1980). "The mere withholding of the enforcement of a right to payment is not a waiver." *White Pass Co. v. St. John*, 427 P.2d 398, 402 (Wash. 1967).

Bailey argues that Borsari waived her rights under the promissory notes by not requiring her to make payments when they came due. (Dkt. No. 53 at 25.) In her sworn declaration, Bailey stated that Borsari told her to pay when she could and never attempted to enforce the terms of the promissory notes. (Dkt. No. 54 at 17.) Borsari has not provided any evidence that she asked Bailey to make payments when they came due. (*See* Dkt. No. 56-3 at 63.)

Nevertheless, Borsari's inaction in seeking payment from Bailey was not a waiver based on the plain terms of the acceleration clause in each promissory note. Each note was a single page document signed by Bailey and Borsari containing the following acceleration clause:

> 5. <u>Acceleration</u>. In the event any payments required by this Note are not paid when due, and such default remains uncured after a date specified by a notice to the Maker, then the whole sum of both principal and interest shall become due and payable at once without further notice, *at the option of the Holder*. The date specified shall not be less than thirty (30) days from the date the notice is given to

Maker.

(*Id.*) (emphasis added). As the holder of the notes, Borsari had the option to require Bailey to make timely payments or, if Bailey became delinquent, to force her to pay the balance of the notes within 30 days after providing notice. (*Id.*) By its very terms, Borsari could choose to trigger the acceleration clause without waiving her right to seek payment from Bailey. *See e.g., Meyers Way Dev. Ltd. P'ship v. Univ. Sav. Bank*, 80 Wash. App. 655, 671 (1996) ("The Bank did not waive its known right. It asserted it, by electing to accelerate the note in accord with the terms of the contract. Summary judgment on this issue was proper."); *Seattle-First Nat. Bank v. Westwood Lumber, Inc.*, 65 Wash. App. 811, 826 (1992) ("The note's terms clearly contemplated that, on default, the holder could either forgo collection or demand immediate payment. We do not view the holder's choice of one option as a waiver of the other.")

Therefore, when Borsari sent Bailey the demand letter requiring full payment under the terms of the contract, she wasn't reinstating an obligation she had waived, she was simply exercising her rights under the acceleration clause. Bailey cites to caselaw that deals with contract waiver outside the context of a party enforcing the agreed upon terms of an optional acceleration contract. (Dkt. No. 53 at 25–26.) As that precedent is inapplicable to this case, there is no genuine dispute of material fact about whether Borsari waived her rights under the contract.

Bailey has not created a genuine issue of material fact as to whether she was in breach of contract. (*See id.*) Bailey does not dispute that she signed every promissory note, that she never paid anything toward the principle, or that the terms of the notes were invalid. (Dkt. No. 54 at 17; 52 at 223–226.)  Based on Borsari's demand letter of April 2017, the Court finds that Bailey is in breach, and owes to Borsari the whole sum of principal and interest outstanding. The Court GRANTS Defendants motion for summary judgment on the breach of contract counterclaim.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 48) is DENIED in part and GRANTED in part. It is DENIED as to Plaintiff's wrongful termination

claim and Defendants' motion to strike evidence. It is GRANTED as to Plaintiff's FLSA and MWA claims, willful withholding of wages claim, defamation claim and as to Defendant Borsari's breach of contract counterclaim.

DATED this 19th day of September 2017.

John C. Coughenour
UNITED STATES DISTRICT JUDGE